1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mary McNamara, SBN 147131
mary@smllp.law
Edward W. Swanson, SBN 159859
ed@smllp.law
Britt Evangelist, SBN 260457
britt@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010


Attorneys for JOHN BLECKA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN BLECKA<br><br><br>Defendants. | Case No.  CR  19-00311-WHA<br><br>**DEFENDANT JOHN BLECKA'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE UNDER 18 U.S.C. § 3553(A)**<br><br>Sentencing Hearing: January 14, 2020<br>Time: 9:00 a.m.<br>Court: Hon. William Alsup |

**TABLE OF CONTENTS**

I.       INTRODUCTION ....................................................................................1

II.      PRESENTENCE REPORT .....................................................................2

III.     SENTENCING RECOMMENDATION: A 24-MONTH SENTENCE IS
         SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE
         GOALS OF SENTENCING ....................................................................2

         A.    The nature of the offense and the history and characteristics of the
               defendant...................................................................................2

               i.    *The nature of the offense*...................................................2

               ii.   The history and characteristics of the defendant ................4

         B.    The purposes of sentencing (just punishment; specific deterrence; and
               general deterrence)......................................................................8

               i.    The need for the sentence to reflect the seriousness of the offense,
                     promote respect for the law, provide just punishment, and afford
                     adequate deterrence...................................................................8

               ii.   The need for the sentence to provide specific deterrence .................10

         C.    The Sentencing Guidelines and their policy statements ................14

         D.    The need to avoid unwarranted sentencing disparity....................17

IV.      CONCLUSION......................................................................................18

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-i-

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Kimbrough v. United States*, 552 U.S. 85 (2007) ................................................................. 14

*United States v. Baker*, 445 F.3d 987 (7th Cir. 2006).......................................................... 9

*United States v. Beiermann*, 599 F. Supp. 2d 1087 (N.D. Iowa 2009)................................... 10

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010)...................................................... 14, 15

*United States v. Garate,* 543 F.3d 1026 (8th Cir. 2008).......................................................... 9

*United States v. Hanson*, 561 F.Supp.2d 1004 (E.D.Wis. 2008)........................................ 15

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011)........................................ 14, 15, 16

United States v. Pauley, 511 F.3d 468 (4th Cir. 2007).......................................................... 9

## STATUTES

18 U.S.C. § 3553(a) ..................................................................................................... 1, 2, 9

Pub. L. No. 108-21, § 501 (2003)............................................................................................ 9

## OTHER AUTHORITIES

*1991 Federal Sentencing Guidelines Manual*, Chp. 2, Offense Conduct, Parts E to K .......................... 16

Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011)....... 9

*The History of Child Pornography Guidelines* at 31-32; *see also 1996 Supplement to the 1995 Federal Sentencing Guidelines Manual*.................................................................. 16

U.S.S.C., *Use of Guidelines and Specific Offense Characteristics, Offender Based*, FY 2018 ................. 4

*United States Sentencing Commission, The History of Child Pornography Guidelines* (Oct. 2009)....... 16

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-iii-

1

## I.      INTRODUCTION

2

3       John Blecka, a 65-year old CPA with no previous criminal history, stands before this Court for

4  sentencing on one count of possession of child pornography.  Mr. Blecka fully acknowledges the

5  seriousness of his conduct – he contributed to the demand for horrific images of child abuse – and he is

6  deeply remorseful for his conduct.  The question is the appropriate length of the sentence in this case.

7  The government argues for a sentence of 78 months, the low-end of the guidelines range.  The Probation

8  Office recommends that the Court vary downward to a sentence of 60 months.  Neither recommendation

9  accounts for all the applicable 18 U.S.C. § 3553(a) factors, most notably the need to avoid unwarranted

10 sentencing disparity. For the reasons set forth in this memorandum, the defense submits that a sentence

11 of 24 months of imprisonment and ten years of supervised release is sufficient but not greater than

   necessary to comply with the statutory sentencing purposes.

12       The grounds for imposing a 24-month sentence are as follows: (1) the nature and circumstances

13 of the offense, including the low number of images involved as compared to the vast majority of child

14 pornography defendants, as well as how Mr. Blecka addressed the 2008 incident recounted by YFZ

15 immediately after it occurred in 2008 – apologizing for his inappropriate behavior, seeking therapy, and

16 fully and consistently acknowledging and feeling shame that his actions caused YFZ suffering; (2) Mr.

17 Blecka's personal history and characteristics, including Mr. Blecka's life-long commitment to

18 community service, as exemplified by his provision of low-cost accountancy services to needy clients,

19 his years of dedication to his local Boy Scouts troop, including as its long-time and beloved leader, and

20 his kindness to those who needed a helping hand, all attested to by the many letters of support filed

21 herewith; (3) the collateral consequences to his wife and two sons of the loss of Mr. Blecka's income

22 and his parental involvement; (4) the extremely low level of recidivism presented by Mr. Blecka, as

23 determined by his treating licensed social worker and a forensic psychologist, as well as the fact that

24 clinical testing shows Mr. Blecka does not suffer from pedophilic or hebephilic disorders; (5) the case

25 law recognizing that the child pornography guidelines are fundamentally flawed and entitled to little

26 weight;  and (6) the need to avoid unwarranted sentencing disparity with similarly-situated offenders,

27

28

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-1-

twenty-five percent of whom received sentences of 24 months or less nationwide and 12 months or less in the Ninth Circuit.

## II.   PRESENTENCE REPORT

Mr. Blecka has no objection to the factual recitations in the Probation Officer's Presentence Report ("PSR") and agrees with the Probation Officer's mathematical calculation of the applicable sentencing guidelines.  Mr. Blecka's total offense level is 28, he has no criminal history, and his advisory guidelines range is therefore 78-97 months.

## III.   SENTENCING RECOMMENDATION: A 24-MONTH SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE GOALS OF SENTENCING

As discussed in detail below, an examination of the factors set forth in 18 U.S.C. section 3553(a) demonstrates Mr. Blecka should be given a below-guidelines sentence.  Mr. Blecka submits a sentence of 24 months is sufficient, but not greater than necessary, to meet the goals of sentencing.  Such a variance from the applicable guidelines is reasonable given the case law determining the sentencing guidelines for child pornography offenses are not based on any empirical evidence, as well as sentencing decisions nationwide imposing far-below guideline sentences on similarly-situated defendants.

### A.   The nature of the offense and the history and characteristics of the defendant

#### i.   *The nature of the offense*

John Blecka is a 65-year-old accountant, the adopted son of Nevada cattle ranchers, whose life has revolved around his wife and two boys, his community and his work.  As the letters to the Court attest, he is a socially-engaged, civic-minded person.  Although he trained with a national accountancy firm, he opened his own small business serving his community in Marin County and doing tax returns for both those who could afford his modest rates and those who could not.  He and his wife have a loving, if sometimes fraught relationship and both are strongly committed to doing good in the world. Mr. Blecka and his wife have taken in people who have fallen on hard times, have nurtured children in their home, and have been stalwarts in their community.  Mr. Blecka has employed former felons and those suffering from severe disabilities, he has given years of nights and weekends to training boys to become Scouts and to inculcating in them a love of their community, the outdoors and community

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

service.  Unlike many child pornography defendants, he is that rare thing – beloved by a wide circle of community members.  His wife and children support him to the fullest.

How then did Mr. Blecka commit the crime of possession of child pornography, a crime that exploits the worst imaginable abuse of children?   As Mr. Blecka explains in his letter to the Court and as forensic psychologist Dr. Jeremy Coles has found, Mr. Blecka came to child pornography not as the result of a long-standing fixation on children, but as an outgrowth of his activity in adult chat rooms.  Evangelist Declaration in Support of Defendant's Sentencing Memorandum ("Evangelist Decl."), **Exhibit A** (Letter of John Blecka); Confidential Report of Psychological Evaluation of John Blecka by Dr. Jeremy Coles ("Coles Report"), 8-12.[1]

Mr. Blecka, who loves his wife of 23 years, has had problems in his marriage – he and his wife had an absence of physical intimacy after the birth of the couple's now teenaged son.  Mr. Blecka's wife has struggled with chronic depression throughout her life, a condition exacerbated by several miscarriages in earlier years.  Mr. Blecka was uncommunicative about what he needed.  Although the couple have endured these challenges and both Mr. Blecka and his wife are loving people and devoted parents, Mr. Blecka failed in his obligation to deal with the difficulties in the marriage.  Had he sought appropriate or mentally-healthy ways of dealing with this problem, it is likely that he would not be before the Court now.  Instead, and to his discredit, he turned to internet adult chatrooms, hoping to find at least a simulation of the intimacy he lacked in his relationship.  After a lengthy period of avoiding his problems in the marriage, his viewing of internet pornography increased.  Coles Report, at 9-10.  Mr. Blecka began to enter chat rooms and exchange pictures with individuals he believed to be adult women.  Id.  At first, he exchanged pictures of himself, and after someone in those chatrooms threatened to post naked pictures of him on the internet, he "found out about a more anonymous site."  Id.  After a while, Mr. Blecka began to portray himself as someone else (younger, and, at times, female) in these chat rooms to obtain more responses.  Id. at 10-11.  However, as is so often the case with the maelstrom that is the internet, the adult chat rooms featured sensationalism and ever-greater levels of outrage and, in the

---

[1] The Coles Report is attached as **Exhibit B** to the Evangelist Declaration and has been conditionally filed under seal.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-3-

case of pornography, deviance.  Anonymity works in an insidious way and is super-charged on the internet – the more extreme the image, the greater the currency of the person who posts it.  Mr. Blecka was one of countless strangers on the internet assuming identities in the hopes of getting some sort of validation, of feeling better about themselves.  It is in these more anonymous chatrooms that he first encountered child pornography and the currency that it gave him.  Id. at 11.

At the time of his arrest, Mr. Blecka possessed between 150 and 300 images of child pornography, a modest number in the mine run of child pornography cases and far fewer than most child pornography defendants.  The vast majority of child pornography defendants – 77.5% – possess 600 images or more, compared to the 4.6% who possess 150-300 images as Mr. Blecka did.[2]  The statistic does not minimize Mr. Blecka's conduct in contributing to the demand for child pornography, but it does demonstrate that this 65-year old man's offense falls at the less serious end of the spectrum, as does the fact that Mr. Blecka did not manufacture images of child pornography and never solicited contact with an actual child.

### ii.    The history and characteristics of the defendant

Mr. Blecka's parents adopted him as a toddler and raised him in a loving home, along with his adopted sister.  PSR, ¶ 52.  He lived and worked on a cattle ranch in Nevada until the ninth grade when the family relocated to Marin County.  Id. at ¶ 53.  His adoptive parents were kind, generous and hard-working people.  Id. at 53-54.  He attended high school in Marin County, college at U.C. Berkeley, and received a master's degree in taxation from Golden Gate University.  Id. at ¶ 67.  During his youth, he participated in track and field and was very active in the Boy Scouts.  Id. at ¶ 53.   After college, he met his wife through a local running club where they were both members – both ran competitively throughout their lives, participating in countless road races.  Id. at ¶ 55.  They married shortly after meeting and, after having difficulty conceiving, eventually had two much-loved sons – J.C. (age 18), and L.M. (age 16).  Id. at ¶ 56.  The older son started college last fall, and the younger is in his junior

---

2 See U.S.S.C., *Use of Guidelines and Specific Offense Characteristics*, *Offender Based*, FY 2018, page 46 (hereinafter "Use of Guidelines Report").  Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2018/Use_of_SOC_Offender_Based.pdf

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-4-

year of high school.  Id.  Mr. Blecka has operated his own small business, a CPA and financial advisory firm serving local community members, since 1991.  He has over 400 clients, many of whom he serves at cost or for no charge.  Id. at ¶ 69.  Although his wife, a trained social worker helping medical patients navigate illness, also works, Mr. Blecka's earnings account for 80% of the family's income.  Id. at ¶ 70. While it remains to be seen whether his conviction in this case will cause him to lose his professional licenses, incarceration in this case will force his clients to seek services elsewhere during his absence, and his business will be shuttered during his incarceration.  Id at ¶ 60.  Mr. Blecka will turn 66 years old in March of this year, approximately the time that he will surrender to serve his prison sentence.  Any period of incarceration beyond 24 months will effectively terminate his ability to support his family for the rest of his life.

In a remarkable show of support, the community at large has joined Mr. Blecka's wife in submitting a flood of letters attesting to Mr. Blecka's inherent kindness, generosity and quiet civic engagement.  See Evangelist Declaration, **Exhibit C** (letters of support).  His wife writes that Mr. Blecka "is a good, kind, sweet, loving, supportive, patient, and generous man, not only to me and our family, but to nearly everyone he encounters."  **Exhibit C** at 001-002.  She explains that she "know[s] this because John is lifelong friends with people from everywhere he has been – from Wells, Nevada, the town his family's cattle ranch was near, from San Rafael/Marin, from Cal, from every job he has had, from any organization in which he has been involved" and "all I ever hear from our communities of friends and family is how kind, funny, thoughtful, hardworking, and generous John is."  Id.

The community letters, every one of them written by people who are aware of Mr. Blecka's offense, are filled with love for Mr. Blecka.  For example, Scott Blaze, the younger brother of one of Mr. Blecka's classmates, describes how Mr. Blecka became a key source of support after Mr. Blaze's parents divorced and his father passed away.  Id at 006.  He writes that "John would often stop by our home just to check in on me - to this day he is remembered for this and adored by my 93-year old mother, brother, 3 sisters and me."  Mr. Blaze explains that John continued to look after and mentor him through college and even into adulthood and says that his "world would be different today had John not stepped in."  Id. at 006.  Numerous other letter writers share Mr. Blaze's assessment of Mr. Blecka and

attest to his honesty and integrity in business dealings, his love of family, and his decency as a community member.  See, e.g., **Exhibit C** at 084-085, Kathryn Rose letter (speaking of Mr. Blecka's kindness as an accountant, choosing to charge below-market rates so that he can help people, rather than become rich); id. at 015 Dave Covey letter (describing how he lived rent-free in Mr. Blecka's house for months when he needed it); id. at 016 Eloise Cutler Clark letter (describing Mr. Blecka's devotion to his parents, his wife and his children); id. at 086 The Very Reverend Henry Sabetti letter (stating Mr. Blecka "is a natural supporter of people, both in his professional work as a CPA and as a community leader."); id. at 013 Joe Cote letter (describing Mr. Blecka as a family man and nurturing figure to fellow runners, including Mr. Cote's sons); id. at 088-089 Louis Shaffer letter (stating that his brother-in-law, Mr. Blecka, is "one of the most caring people I have ever known"); id. at 100 Craig Stern letter (the best man at Mr. Blecka's wedding saying that "John would never say 'no' to anyone asking for a helping hand."); id. at 092-096 Peter Smith letter (a friend and client of Mr. Blecka's remarking on his devotion to his elderly parents, his civic engagement, community involvement, kindness and business integrity); id. at 065 Vicky Nissen letter (recalling how her friend, Mr. Blecka, traveled scores of miles to be the first see her husband after heart surgery); id. at 024 Dianne and Phillippe Gaiddon (Mr. Blecka's clients, explaining how Mr. Blecka shared his experience of adoption with the Gaiddons to help them through the process).

As Mr. Blecka's wife writes in her letter to the Court, "[o]ne area of his life where John has been particularly giving is his involvement in the Boy Scouts."  Id. at 001.  His sons joined the Scouts in 2008 and 2009, and Mr. Blecka quickly became the Cub Scout Bear Den Leader and eventually Scoutmaster for Troop 101, as well as Troop Committee Chairman.  PSR at ¶ 58.  He led his troop on numerous community projects, including collecting food for the needy, as well as various coastal, park and wilderness cleanup projects.  He devoted additional time to helping scouts complete Eagle Scout projects, such as repairing picnic tables, building retaining walls and improving the landscaping in local parks.  Id.  Mr. Blecka's wife recalls him "put[ting] hours and hours into helping the boys with earning their merit badges, leading or going on hikes, going to scout camp every summer, and on outings, and camping trips and all kinds of scout programs, including training/drills for triage and safety, and

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-6-

attending adult trainings and mentoring assistant scout masters and other scout parents as well." **Exhibit C** at 001.  As a result of his dedication to the Scouts, Mr. Blecka received two Volunteer of the Year awards.  Evangelist Decl., **Exhibit D**; PSR, ¶ 58.

Fellow volunteers at the Boy Scouts and parents of children in the Boy Scouts have also submitted letters in support of Mr. Blecka.  Those letters tell of Mr. Blecka's commitment to the Boy Scouts and explain how he took pains to abide by and enforce the Boy Scout's youth protection guidelines.  For example, one fellow Boy Scouts volunteer, Kathryn Rose, writes that Mr. Blecka "believed in helping all scouts reach their potential" and that he "committed countless hours selflessly to the Troop." **Exhibit C** at 084-085.  Ms. Rose also describes Mr. Blecka as "an absolute role model of youth protection practices that keep children safe" and explains that Mr. Blecka not only abided by those Boy Scout's guidelines aimed at preventing abuse by scoutmasters but helped to ensure that others did so as well.  Id.  In their letter to the Court, Tony Key and Cristina Battani speak glowingly of Mr. Blecka's selfless dedication to the scouts of Troop 101, his stepping up to assume the demanding role of Scoutmaster, and his spending weekends leading the Scouts in community service and merit badge activities.  Id. at 045-046.  Mr. Key writes movingly of Mr. Blecka's devotion in helping both of Mr. Key's sons achieve Eagle Scout status (see picture embedded in letter).  Travis Jones, another parent and Scout volunteer speaks of the "enormous amount of work" entailed in being Scoutmaster and recalls that "John rarely missed a meeting even when he was up to his eyeballs in work during tax season."  Mr. Jones notes how Mr. Blecka put 110% into every meeting and activity of the Scouts in his troop and how he would write long reports every summer lauding the scouts' achievements.  Id. at 040.  Tara Jones likewise writes of Mr. Blecka's honorable and kind character and his standout generosity as a Boy Scout leader: "I couldn't ask for a better role model for my son."  She also states her confidence in Mr. Blecka's behavior, declaring that she would trust him around her 16-year-old daughter.  Id. at 041.

Finally, in determining the appropriate sentence for Mr. Blecka, the Court may consider how his incarceration will affect the other members of his family.  Mr. Blecka's wife, the person in the best position to predict that effect, explains the struggles that lie ahead for the Blecka family.  **Exhibit C** at 002.  Financially, the family will lose over two-thirds of their income and possibly their home of 23

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

years.  She worries that her sons, who "are very close to and love their dad deeply," will suffer emotional and mental health consequences; one son has already been diagnosed with depression.  Most of all, she worries about her ability to hold the family together in Mr. Blecka's absence.  She explains that "I suffer from and have been treated for chronic depression since I was an anorexic teenager" and that she is "afraid of falling into a deeply dysfunctional state which I have done before when affected by grief or loss or huge stress, and of not being able to cope with all that will fall on me without John."  Id. at 002.  A letter from her treatment provider states that Mr. Blecka's incarceration and the increase in familial and financial responsibilities for Mr. Blecka's wife that will accompany that incarceration, "could trigger a decline in her mood into a deeper depression or possibly a suicidal ideation."  PSR, ¶ 57.

Mr. Blecka's history of good deeds does not, of course, forgive or excuse the crime he committed and for which he must receive punishment.  And the effect incarceration will have on Mr. Blecka's family does not offset how Mr. Blecka's conduct contributed to the demand for images that in turn contain violence against the child-victims.  But Mr. Blecka's history is indicative of how he is likely to conduct himself during the ten-year period of supervised release and beyond.  With the support of his family and strong connections to his community, Mr. Blecka will continue with the treatment and rehabilitation that he has shown such promise in and that has resulted in excellent reports from both his treating therapist and the forensic psychologist (discussed below).  The hardships endured by Mr. Blecka's wife and children during his incarceration will also be an ever-present reminder of the cost that he has caused those he loves to bear.  Given Mr. Blecka's history and characteristics, a guidelines sentence is not necessary for the public safety or to impress on Mr. Blecka the need to reform.

**B.      The purposes of sentencing (just punishment; specific deterrence; and general deterrence)**

      *i.      The need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence*

A 24-month sentence is sufficient to reflect the seriousness of the offense conduct, provide just punishment, an deter others.  While any felony conviction carries social stigma, few offenses are considered as shameful as those involving child pornography, and Mr. Blecka now faces the substantial

challenges of living as a registered sex offender.  Mr. Blecka may also lose the ability to work in accountancy, the only profession he has known.   Even if he somehow manages to retain or regain his licenses, he will have no practice to speak of after serving his sentence – he will be 68 years old, a convicted sex offender, and his clients will have gone to new CPAs.

Several courts have recognized collateral consequences such as registration as a sex offender as relevant to the need for the sentence imposed to reflect just punishment.  *See United States v. Garate*, 543 F.3d 1026, 1028-29 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id*. § 3553(a)(2)(A), and "adequate deterrence," *id*. § 3553(a)(2)(B)).  And, in cases such as this one where the defendant is facing his first period of incarceration, a short period of confinement achieves the goals of sentencing and provides just punishment. *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) ("a prison sentence would mean more to [a defendant who has never been imprisoned] than to a defendant who previously had been imprisoned.  Consideration of this factor is consistent with section 3553's directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'").

As to the argument that harsh sentences deter the underlying abuse of children that features in the images, the available research is to the contrary.  Janis Wolak et al., *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production.").  Congress, too, has found to the contrary, i.e., that child pornography is produced as a by-product of the sexual abuse of children. Pub. L. No. 108-21, § 501 (2003) (finding "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children.")  And as other courts have recognized, child pornography is

ubiquitous on the internet and is a social scourge defying an iterative sentence-by-sentence approach. The hard truth is that there is no evidence to show that a lengthier sentence for low level offenders like Mr. Blecka will have any appreciable impact on the producers of child pornography.  *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103-04 (N.D. Iowa 2009) (no evidence in the record "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."); *id*. at 1104 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").  A longer custodial sentence therefore would not enhance the general deterrence effect.

A sentence of 24 months, in conjunction with the collateral consequences of Mr. Blecka's conviction as discussed above, including the social stigma and sex-offender registration requirements that attach to such a conviction, are sufficient to provide general deterrence, just punishment and reflect the seriousness of the offense.

### ii.    The need for the sentence to provide specific deterrence

Nor is additional punishment necessary for specific deterrence.  As a general matter, individuals convicted of possessing child pornography are not at high risk of recidivating.  As explained in the psychological report by Dr. Coles, "[r]esearch addressing recidivism amongst child pornography offenders suggests that most individuals who are caught in possession of child pornography are not likely to commit further child pornography crimes and are even less likely to commit a future hands on sex offense."  Coles Report, 17.  In his report, Dr. Coles cites two studies regarding recidivism rates for child pornography offenders.  The first study found 3.4% of child pornography offenders committed another child pornography offense and only 2% committed a contact sexual offense.  Likewise, at 2012 study by the U.S. Sentencing Commission found a 2.3% of child pornography offenders committed a subsequent child pornography offense and 3.6% were rearrested or convicted of a hands-on sex offense.  Id.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-10-

In addition to belonging to a class of defendants that is statistically unlikely to recidivate, Mr. Blecka individually is at extremely low risk of recidivism.  Dr. Coles finds that Mr. Blecka "does not represent a liability in terms of his risk for sexual reoffense" and is instead "at **extremely low risk** for committing a future sex offense."  Id. at 19-20 (emphasis added).  Dr. Coles based his conclusion on recidivism on the following tests and techniques.

First, Dr. Coles interviewed Mr. Blecka's sex-offender-treatment therapist, the highly respected licensed clinical social worker Dan Doyle of the San Francisco Forensic Institute.   Mr. Doyle reported that Mr. Blecka "has been actively engaged in his treatment, attempting to understand [his] behavior [in this case] and its origins."  Id. at 11-12.  As a result, Mr. Doyle "views Mr. Blecka as being at extremely low risk for sexual reoffense of any kind."  Id. at 12.

Dr. Coles administered several clinical tests to determine Mr. Blecka's risk of reoffense as an objective matter.  Dr. Coles administered a personality exam to determine if Mr. Blecka "possesses antisocial personality traits and/or ego functioning deficits that may increase his risk for committing a future offense."  Id. at 13.  This test revealed Mr. Blecka to be "prosocial," having a life characterized by "educational and occupational endeavors, and one long-term relationship," and found "no indication that [Mr. Blecka] suffers with poor impulse control, lack of rational ability, or low frustration tolerance," traits that could be indicative of a recidivism risk.  Id. at 15.

Dr. Coles also administered a sex-offender recidivism risk assessment test, the Static-99-R.  This test concluded that that someone with Mr. Blecka's score (-2) can be expected to reoffend at a rate of 1.3%, and, mitigating the reoffense risk even further, Dr. Coles notes that Mr. Blecka falls within the age category range where few offenders go on to reoffend.  Id. at 17-18.

Finally, Mr. Coles undertook a dynamic risk analysis of Mr. Blecka to determine if Mr. Blecka possesses factors found to be related to sexual recidivism.  Id. at 19-20.  Here, Dr. Coles concluded that Mr. Blecka "is not criminally minded and does not suffer with pervasive impulse control problems nor hostility that he is liable to act upon."  Id. at 19.  Factors supporting this conclusion include that Mr. Blecka does "not suffer[] with pervasive intimacy deficits," but has instead "been involved in one very long-term relationship" which "indicates that not only is Mr. Blecka able to engage in intimate

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

relationships with adults but that this is his clear preference," and that Mr. Blecka "has not demonstrated any difficult adhering to conditions of supervision."  Id.

As the Court is aware, in the wake of public reports of his arrest on these charges, YFZ has reasserted an incident that occurred in 2008.  In that incident, Mr. Blecka touched YFZ inappropriately on the leg and then withdrew, telling her that he was getting aroused.  There was no further touching of any kind.  She was 13 years old at the time.[3]  Back in 2008, YFZ's mother addressed Mr. Blecka's behavior with Mr. Blecka and his wife, and Mr. Blecka immediately apologized and went to counseling to understand what had led to the behavior.  YFZ has written that, in light of the current child pornography offense, she and her family – which was very close to the Blecka family at the time – have grappled with whether Mr. Blecka acted impulsively but stupidly and inappropriately or if he is actually a pedophile of some sort.  YFX VIS at page 3.  The defense has sought to answer that question as well.

To that end, Dr. Coles assessed whether Mr. Blecka suffers from a pedophilic or hebephilic (adult sexual attraction to pubescent children) disorder to consider Mr. Blecka's risk of recidivism in light of the YFZ 2008 incident.  Dr. Coles concluded Mr. Blecka does not suffer from pedophilia or hebephilia.  Id. at 15-17.  Dr. Coles explained that the 2008 incident does not cause him to conclude Mr. Blecka suffers from these disorders because, among other things, "a single act does not signify intense and recurrent urges" that characterize these disorders.  Rather, if Mr. Blecka did suffer from these disorders, Dr. Coles would expect to see "more examples of these urges or behaviors in his history."  Id.

---

[3] The events of this incident are largely not in dispute.  YFZ reported that that while putting Mr. Blecka's son to bed they started talking about her muscles and her fear that the medication she was taking was causing the loss of muscle mass.  Coles Report, 6-7 (summarizing police reports).  Mr. Blecka put his hand on her leg and rubbed it.  YFZ reported that Mr. Blecka then told her that he had been attracted to her for years – which Mr. Blecka disputes - and that he moved a mattress into the room where she was sleeping on a couch.  Id.  Mr. Blecka acknowledged to Dr. Coles that while he and the victim were talking about running, he began to rub her leg.  Mr. Blecka explained he did not initially touch the victim's leg for the purpose of sexual gratification but admitted he became aroused when doing so and communicated this to YFZ – a serious breach of boundaries and something that he acknowledges frightened YFZ.  Mr. Blecka also admitted to later moving a mattress into the room where YFZ was sleeping, but explained the YFZ was sleeping in the room he usually occupied because he and his wife were not sleeping in the same room at that time.  YFZ does not allege that Mr. Blecka made any inappropriate advances after moving the mattress into the room, and Mr. Blecka likewise reports that he moved the mattress into the room and went to sleep.  Id. at 7.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

at 16.   Dr. Coles also noted a number of factors indicating Mr. Blecka does not suffer from these

disorders, including the fact that Mr. Blecka's "life history reveals an ability to be engaged in long-term

relationships with age appropriate partners," that he is engaged in comprehensive sex offender treatment

and "is making a genuine effort at understanding his behavior,"[4] that despite a  search by law

enforcement, Mr. Blecka's electronic devices showed "absolutely no indication that he was attempting

to meet up with a minor," and that "after [Mr. Blecka's] name was in the paper [on this case] and his

community knew that he had been arrested in the current matter, no other people came forward alleging

sexual misconduct."  Id. at 16-17.

        To explore the worst possible inferences from YFZ's allegations as transparently as possible, the

defense also requested that Dr. Coles administer the sex-offender recidivism test (the Static-99-R test)

with counter-factual assumptions, namely that Mr. Blecka had acted intentionally toward YFZ and had

been convicted of a sex offense for the 2008 incident.  As Dr. Coles explains, from a clinical

prospective, proper scoring of the Static-99-R test does not involve adding points to Mr. Blecka's score

for an incident that did not result in a conviction, on the basis that a criminal conviction places the

offender on notice such that future behavior must be assessed in light of that notice.  Nonetheless, Dr.

Coles addressed the YFZ incident as if Mr. Blecka had been criminally convicted and determined that

Mr. Blecka's risk assessment score would not increase appreciably, resulting in a reoffense rate of only

2.8%.  Id. at 18.

        Thus, regardless of how one considers the isolated incident in 2008, Mr. Blecka remains at

extremely low risk of recidivism.  Mr. Blecka's letter to the Court and his wife's letter to the Court make

clear that Mr. Blecka regrets his conduct and is taking seriously the therapy that will do the most to

ensure he does not reoffend.  In his letter to the Court, Mr. Blecka explains that before his arrest in this

case "I compartmentalized my life and justified my actions to myself" by telling "myself that there was

a big difference between me, who was viewing pictures on the internet, and the people in the pictures,

who were actually assaulting the children."  **Exhibit A**.  But through therapy he now "understand[s] that

---

[4] Mr. Blecka admitted being horrified by his conduct and reported that he is dealing with it openly and
thoroughly in his treatment with Mr. Doyle.  Coles Report, 7.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

because I and others like me will view the images, those kids are hurt." Id. Mr. Blecka writes, "To say that I profoundly regret how my actions contributed to the suffering of children is an understatement," and he asks the Court to "believe me when I say that I am committed to my treatment and will do whatever is necessary to ensure that I never do something like this again." Id. Mr. Blecka also acknowledges the pain and suffering that his conduct has caused his wife and children and vows "I will not let them down in the future" nor "betray their support by making the same mistake a second time." Id. Mr. Blecka's wife has likewise observed her husband's commitment to therapy. She writes, "I know that he is working hard in therapy, and making tremendous progress, becoming more self-aware than I have ever experienced him being before, and I see that he wants to and does participate any way he can in making amends." Evangelist Decl., **Exhibit C** at 002; PSR, ¶ 57.

Finally, the Court can and should fashion strict conditions of probation, such as limits on computer use, monitoring of internet activity, continued participation in therapy, and psychiatric treatment, that will further reduce or eliminate any concern the Court may have about future offense conduct.

### C.     The Sentencing Guidelines and their policy statements

The Sentencing Commission "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (citation and quotation omitted). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* (citation and quotation omitted). The guidelines at issue in this case, however, are "fundamentally different from most." *United States v. Dorvee*, 616 F.3d 174, 184-85 (2d Cir. 2010). "The child pornography Guidelines were not developed in a manner 'exemplifying the Commission's exercise of its characteristic institutional role.'" *United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) (quoting *Kimbrough*, *supra*); *Dorvee*, 616 F.3d at 185 (explaining how "the [Sentencing] Commission did not use [the] empirical approach in formulating the Guidelines for child pornography"). Rather, as a result of congressional directives, the child pornography guidelines "have been substantively revised

nine times during their 23 years of existence.  Most of the revisions were Congressionally-mandated and not the result of an empirical study." *Henderson*, 649 F.3d at 962.  The base offense level, originally set at 10 points, is now 18, *id.* at 960-62, with no empirical data to support the nearly two-fold increase.

In addition to increases in base offense level that are untethered to any empirical research, § 2G2.2 suffers from another shortcoming: a series of specific offense characteristics that "are all but inherent to the crime of conviction."  *Dorvee*, 616 F.3d at 186; *see also United States v. Hanson*, 561 F.Supp.2d 1004, 1008 (E.D. Wis. 2008) ("[Section 2G2.2] contains numerous and significant enhancements for factors that are present in many if not most cases . . . [and thus] diverges significantly from the Sentencing Commission's typical, empirical approach.").  Sentencing Commission data for fiscal year 2018[5] shows that several of the enhancements applicable to Mr. Blecka were imposed in the vast majority of cases:

| Subsection of § 2G2.2 | Percentage of cases |
|---|---|
| (b)(2) prepubescent victim (+2 levels) | 94.8% |
| (b)(4) sadism/masochism or infant/toddler victim (+4 levels) | 84.8% |
| (b)(6) use of a computer (+2 levels) | 96.6% |

As a result of these many revisions and the growing number broadly applicable enhancements, many child pornography defendants face excessive sentences, especially when compared to the sentences they would have faced under prior iterations of § 2G2.2.  Mr. Blecka, for example, would have faced a guideline range of 21 to 27 months (assuming a three-point reduction for acceptance of responsibility) had he been sentenced under the 1991 version of § 2G2.2, the first year that possession of child pornography became a federal crime.  *See United States Sentencing Commission, The History of*

_____

[5] Use of Guidelines Report, page 45.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA
-15-

*Child Pornography Guidelines* (Oct. 2009) at 10-11[6]; *see also 1991 Federal Sentencing Guidelines Manual*, Chp. 2, Offense Conduct, Parts E to K.[7]   Had he been sentenced under the 1996 version of §2G2.2, his sentencing range would have been 51 to 63 months. *The History of Child Pornography Guidelines* at 31-32; *see also 1996 Supplement to the 1995 Federal Sentencing Guidelines Manual*.[8]   In the intervening years, the applicable guidelines section for the same conduct increased several more times.  By the time of Mr. Blecka's offense conduct, the recommended range had ballooned to the current 78 to 97 months.

Yet another problem with § 2G2.2 is that the guideline often recommends "longer sentences for those who receive or distribute images of minors than the applicable Guidelines recommend for those who actually engage in sexual conduct with minors." *Henderson,* 649 F.3d at 965 (Berzon, J., concurring) (citation omitted).  If Mr. Blecka had pleaded guilty to sexually abusing a minor (18 U.S.C. § 2243(a)), his guidelines would have been *lower* than they are for the instant offense, even if every possible enhancement to that guidelines section were applied.  *See* § 2A3.2.[9]  The arbitrary nature of § 2G2.2 is seen too in comparison to guidelines that address serious, violent conduct.  For example, had Mr. Blecka robbed a bank, brandished a firearm, and committed carjacking in an effort to escape, his final offense level would be level 26 as opposed to his level 28.  *See* § 2B3.1.[10]

---

[6] Available at: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf

[7] Available at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1991/manual-pdf/Chapter_2_E-K.pdf

[8] Available at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1996/1996_Supplement_to_1995_Guidelines_Manual.pdf

[9] Section 2A3.2 sets a base offense level of 18, to which 4 levels are applied where the offender had a close relationship with the minor, and an additional 2 levels for use of a computer, totaling 24 from which three levels would be deducted for acceptance of responsibility, for a total offense level of 21.

[10] Section 2B3.1(a) sets a base offense level of 20, to which two levels are applied when a financial institution is robbed, and an additional five levels for the brandishing of a firearm, and two more for the carjacking, totaling 29 from which three levels would be deducted for acceptance of responsibility, for a total offense level of 26.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thus, while Mr. Blecka does not dispute the guidelines calculation in this case as a mathematical matter, the base offense level and specific enhancements provided for in the current version of § 2G2.2 are not grounded in empirical data and result in a guidelines calculation greater than necessary to achieve the goals of sentencing. Counsel submits that the Court's sentence should account for the growing concerns about the way § 2G2.2 overstates the offense conduct. A sentence below the applicable guidelines range is warranted.

**D.      The need to avoid unwarranted sentencing disparity**

Sentencing courts have recognized the jerry-built nature of § 2G2.2, and they have not hesitated to exercise their authority under *Booker* and *Kimbrough* to impose sentences that they deem reasonable without regard to the guidelines calculations. The Sentencing Commission publishes extensive data on sentences imposed, allowing for a detailed comparison between defendants. From FY 2010 to FY 2018 (the last year for which data is available), the overwhelming majority of offenders with the same guideline particulars[11] – offenders with the same number of criminal history points and the same enhancements as Mr. Blecka – received a below-guidelines sentence: 85% of offenders nationwide and 100% of offenders within the Ninth Circuit received a below-guidelines sentence. See Evangelist Declaration, **Exhibit E** (summary of Sentencing Commission data). And the average sentence imposed on like offenders nationally was significantly below Mr. Blecka's guideline range at 46.2 months, while the median sentence was 42 months. The figures are even lower in the Ninth Circuit, with an average sentence of 31.9 months and a median sentence of 31 months. In other words, courts across the country have determined that the average defendant who used a computer to possess more than 150 or 300 images of child pornography, including depictions of prepubescent victims and images that qualified as sadistic or masochistic (or depicted infant victims, which triggers the same enhancement), should receive a sentence of fewer than four years, and courts in this Circuit have determined that such defendants should receive, on average, a sentence of fewer than three years. This same dataset shows that nationwide the lower quartile of offenders with Mr. Blecka's same guidelines range receive a

---

[11] In analyzing the guidelines data, per the plea agreement, we assumed a total offense level of either 28 or 29, depending upon the number of images.

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA

-17-

sentence of 24 months or lower, while within the Ninth Circuit, offenders in the lower quartile receive a sentence of just over one year.  Id.

The need to avoid unwarranted sentencing disparity does not seem to have been factored into the sentencing recommendation by the government or the Probation Office.  The government asks that the Court impose a guidelines sentence, without reference to the fact that not one similarly situated offender in the Ninth Circuit has received such a sentence.  And, although undersigned counsel submitted the Sentencing Commission data to the Probation Office, that data does not seem to have been factored into that Office's recommendation.  See PSR, ¶ 91 (noting possible grounds for departure, but not including reference to this data or the need to avoid unwarranted sentencing disparity); id. at Sentencing Recommendation (accord).  Thus, while the Probation Office seems to agree that a downward variance is warranted based on Mr. Blecka's life history, its recommendation of 60 months does not account for the typical sentence in a case like Mr. Blecka's.

Undersigned counsel submits that the average and median sentences imposed on defendants similar to Mr. Blecka constitute persuasive evidence that a significantly below-guidelines sentence is appropriate in your typical of this type.  And, in accord with the Probation Office's recommendation of a downward variance based on Mr. Blecka's history and characteristics, undersigned counsel submits that Mr. Blecka should be sentenced to custodial time consistent with that imposed on the lower quartile of offenders nationally and within the Ninth Circuit.  The defense therefore requests that the Court impose a sentence of 24 months.

## IV.    CONCLUSION

For the foregoing reasons, the defense respectfully requests that this Court sentence Mr. Blecka to 24 months imprisonment to be followed by ten years of supervised release.

DATED: January 7, 2020

_____/s/_____
                              MARY McNAMARA
                              EDWARD W. SWANSON
                              BRITT EVANGELIST
                              Swanson & McNamara LLP
                              Attorneys for JOHN BLECKA

**Defendant's Sentencing Memo. And Mtn. for Variance**
*United States v. Blecka*
CR 19-00311-WHA